**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Paul Turnovec, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | Case No. 1:06-cv-83 |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Paul Turnovec ("Turnovec"), seeks judicial review of the Social Security Commissioner's determination that his disability ceased as of March 31, 2004.  Chief Judge Daniel L. Hovland has referred this matter to the undersigned for preliminary consideration.  For the reasons set forth below, the undersigned recommends that Chief Judge Hovland affirms the Commissioner's determination.

I.    **BACKGROUND**

A.    **Procedural History**

Turnovec filed an application for disability insurance benefits on December 28, 1999. (Tr. 69-71).  The Social Security Administration ("SSA") approved his application on January 25, 2000, finding him disabled as of December 3, 1999.  (Tr. 24)  Following a continuing disability review in March 2004, it determined that his condition had improved to the extent he could no longer be considered disabled as defined by the Social Security Act.  (Tr.  25, 33-35).  Consequently, on

---

[1]  On January 20, 2007, Linda S. McMahon became the Acting Commissioner of Social Security.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Linda S. McMahon has been substituted for Commissioner Jo Anne B. Barnhardt as the defendant in this suit.

1

March 18, 2004, it advised him that his disability insurance benefits would cease effective March 31, 2004.  (Tr. 33-35).

A disability hearing was convened on March 8, 2005, at Turnovec's request.  (Tr. 36, 43). Turnovec appeared with counsel and testified on his own behalf.  (Tr. 43).  On March 11, 2005, the hearing officer issued a decision wherein he concluded that Turnovec's condition had improved to the extent that it was no longer of listing level severity and that Turnovec was no longer precluded from performing light, sedentary work.  (Tr. 41-52).  Consequently, in a Notice of Reconsideration dated March 14, 2005, the SSA advised Turnovec that he was no longer eligible for disability insurance benefits.  (Tr. 38-39).  Turnovec disagreed and promptly filed a request for a hearing before an administrative law judge ("ALJ").  (Tr. 53).

Pursuant to Turnovec's request, ALJ James Geyer convened an administrative hearing on May 3, 2006.  (Tr. 239-292).  On August 2, 2006, ALJ Geyer issued his decision–that Turnovec's disability had ceased as of March 31, 2004.  (Tr.11-18).  The Appeals Council denied Turnovec's subsequent request for reconsideration and adopted ALJ Geyer's findings as the Commissioner's final decision.  (Tr. 5-8, 238).  Dissatisfied, Turnovec filed a complaint with this court on October 24, 2006, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

On January 24, 2007, the Commissioner filed a Motion for Summary Judgment.  See Docket Nos. 6-7.  Turnovec filed a reply in opposition to the motion on February 26, 2007.  See Docket Nos. 8-9.  This matter is therefore ripe for the court's consideration.

### B.    Education and Work History

Turnovec was born on September 6, 1951.  (Tr.  16, 245).  After graduating from high school, he went on to complete two years of vocational training at a technical college in Mitchell,

South Dakota. (Tr. 247, 2543). He was subsequently drafted and served two years in the army. (Tr. 69, 247, 253). Upon his discharge from the army, he worked as a construction electrician. (Tr. 245, 247, 253).

Turnovec has been diagnosed with vascular necrosis, a condition which has necessitated three hip replacement surgeries and prevented him from engaging in substantial gainful activity since December 3, 1999. (Tr. 43, 139, 150, 165, 167-69, 227). He also suffers from asthma and has documented allergies to penicillin, chemical vapors, pet dander, and dusts. (Tr. 207). He has at various times taken Benadryl, Singulair, and Allegra for his allergies. (Tr. 153, 154, 251). For asthma relief, he has at various times taken Albuterol and Primatene mist. (Tr. 257). Although he was initially prescribed medication for his hip pain, he now relies primarily upon Tylenol for relief. (Tr. 251).

### C.    Medical Records

Turnovec presented to an orthopedist, Dr. Charles Dahl, on October 14, 1999, complaining of hip pain. (Tr. 227). Upon examination, Dr. Dahl observed that the range of motion in Turnovec's hip was limited and painful in all directions. (Tr. 227). X-rays revealed mild degenerative changes in Turnovec's lumbar spine as well as bilateral avascular necrosis of Turnovec's hips. (Tr. 227-28, 230). In Dr. Dahl's opinion, Turnovec's condition rendered him "totally disabled from doing his present job with or without total hip replacements." (Tr. 228). Dr. Dahl advised Turnovec of his surgical options and instructed him to curtail his physical activity, suggesting that he may want to seek out a more sedentary occupation. (Tr. 227). In the event that Turnovec opted for surgery, Dr. Dahl projected that Turnovec would be restricted from carrying more than twenty pounds, using ladders, or engaging in "impact loading." (Tr. 228).

Turnovec filed an application for disability insurance benefits on December 28, 1999, alleging an onset date of December 3, 1999. (Tr. 69-71). Shortly thereafter, on January 18, 2000, he returned to Dr. Dahl with complaints of increased pain while walking, a moderate degree of limping, an inability to walk more than six blocks at a time, and an inability to sit for more than one hour at a time. (Tr. 225). He was advised by Dr. Dahl that sooner or later both of his hips would have to be replaced. (Tr. 226).

Turnovec's records indicate that, at various times, he was prescribed Lorcet[2] and Celebrex for his pain but was able to obtain little relief. (Tr. 88, 165, 170). According to the Personal Pain Questionnaire completed by Turnovec in conjunction with his application for disability benefits, pain radiated from his hips to his knees, making it difficult for him to walk and requiring him to take frequent breaks when performing household chores. (Tr. 88-89).

Turnovec underwent a total right hip replacement on April 7, 2000, after which he was prescribed Lorcet and Coumadin.[3] (Tr. 43, 139, 165, 167-69, 176-78). At the time of Turnovec's discharge from the hospital, Dr. Dahl noted that Turnovec was doing quite well postoperatively and was independent with ambulation. (Tr. 165). In follow-up visits, Dr. Dahl reported that the pain in Turnovec's right hip had abated to some extent and that he was able to walk in a more normal fashion, but that he continued to have trouble with stairs. (Tr. 157, 154).

Turnovec underwent a total left hip replacement on August 18, 2000, after which he was again prescribed pain killers and Coumadin. (Tr. 43, 150, 160-61). Although he experienced some

_____

[2]This prescription medication is a combination of a narcotic (hydrocodone) and a non-narcotic (acetaminophen) used to relieve moderate to severe pain.

[3]Coumadin is in a class of medications called anticoagulants or "blood thinners." It is used to prevent blood clots from forming or growing larger in the blood and blood vessels.

improvement in his range of motion in the months following surgery, his left side failed to stabilize and he continued to complain of discomfort in his left hip. (Tr. 134, 139, 149-52, 214-15). In addition, he complained that his allergies and asthma had flared up. (Tr. 139). For asthma relief, he treated with Primatene mist. (Tr. 139). He also took Benadryl for his allergies but reported that it left him feeling groggy. (Tr. 153).

In January 2001, Turnovec learned that both of his hips implants were defective and had been recalled by their manufacturer. (Tr. 134, 215, 243, 214). Dr. Dahl observed that Turnovec had excellent range of motion but was walking with a limp and experiencing significant "start up pain." (Tr. 217-18). Dr. Dahl advised Turnovec of the specific problems with his implants and the risks that revisions posed. (Tr. 219). Turnovec opted to proceed with the revision despite these risks. (Tr. 219).

On February 16, 2001, Turnovec underwent a revision of his left hip replacement. (Tr. 27, 42, 219). Dr. Dahl deemed the revision a success, observing in his post-operative notes that Turnovec's left hip was now stable, that Turnovec "did extremely well with his ambulation" following surgery, and that Turnovec's pain had been fairly controlled with medication. (Tr. 134-37).

Turnovec returned to Dr. Dahl for periodic evaluations between March and July 2001. (Tr. 210-11). Dr. Dahl's notes of these visits reveal that Turnovec was making steady progress with respect to his range of motion and was able to ambulate without significant discomfort. (Tr. 210-12).

Turnovec reported to Dr. Gerry Lunn on August 8, 2003, asking that his prescriptions for Albuteral and Allegra be renewed. (Tr. 233-35). Noting that Turnovec had long suffered from

asthma and allergic rhinitis, Dr. Lunn renewed these prescriptions with the recommendation that Turnovec should return for a more comprehensive examination in the near future. (Tr. 233).

Turnovec next returned to Dr. Dahl for an evaluation on January 29, 2002. (Tr. 210). According to Dr. Dahl's notes, Turnovec continued to have some balance issues but that was otherwise doing extremely well, was able to walk without difficulty, had minimal pain complaints, and appeared to be generally pleased with his present situation. (Tr. 210). Dr. Dahl nevertheless recommended that, while Turnovec could continue "with full activity," he should permanently refrain from heavy lifting and engaging in impact activities. (Tr. 210). Dr. Dahl further recommended that Turnovec return to the clinic for a follow-up examination in one year. (Tr. 210).

The record reveals that Turnovec next returned to Dr. Dahl on February 17, 2004. (Tr. 207). Dr. Dahl noted that Turnovec was "doing fine" and was able to ambulate without difficulty but had problems when lifting too much, fatigued easily, and did experience discomfort in his hips when squatting. (Tr. 207). Dr. Dahl advised Turnovec that he should not "go back to a labor type of job" and that he should restrict his activities to those that are fairly sedentary. (Tr. 209).

An SSA medical consultant, Dr. T.H. Christianson, assessed Turnovec's physical residual functional capacity ("RFC") for the SSA on March 7, 2004. (Tr. 190-197). Based upon his review of Turnovec's medical records, Dr. Christianson concluded that Turnovec was capable of lifting twenty pounds occasionally, lifting ten pounds frequently, sitting for a total of six hours in an eight-hour workday, and standing and/or walk for a total of six hours in an eight-hour workday. (Tr. 191). Dr. Christianson added that Turnovec's condition contributed to occasional postural limitations and limited Turnovec's ability to push and/or pull with his lower extremities, but that Turnovec exhibited no observable manipulative, visual, communicative, or environmental limitations. (Tr.

6

191-94).  Dr. Christianson concluded his assessment by opining that, while Turnovec was incapable of performing his past relevant work, his condition would not necessarily preclude him from engaging in light work activities.  (Tr. 195).

Turnovec's RFC was next assessed for the SSA on April 14, 2004, by Dr. M.J.E. Johnson. (Tr. 198-205).  Aside from a difference of opinion regarding Turnovec's ability to push and/or pull with his upper and lower extremities,[4] Dr. Johnson's findings essentially mirrored the earlier assessment of Dr. Christianson in that he too concluded that Turnovec exhibited no observable manipulative, communicative, or environmental limitations and remained capable of lifting ten pounds frequently, lifting twenty pounds occasionally, and standing, walking, and/or sitting for up to six hours in an eight-hour workday.  (Tr. 199-205).

In a letter dated May 3, 2004, Dr. Dahl advised Turnovec's counsel that Turnovec was doing well following his hip replacement surgeries but did have a permanent impairment on account of his condition.  (Tr. 206).  Specifically, Dr. Dahl stated:

> Mr. Turnovec has been a patient of mine over four to five years.  He is doing well status post hip replacement but because of his total hip replacement he does have permanent impairment in relationship to activity.
>
> First of all we recommend that the patient not do any running or jumping whatsoever.  This means even stepping out of a truck or off a platform.  He should always step down and not jump down.  I usually keep their lifting restrictions at approximately 20 pounds and this is permanent.  Periodically they can lift 30 to 40 pounds up one time to move it, but they are not to be carrying that type of weight around.  He is also restricted in that he should not bend his hip farther than 90 degrees or get into precarious positions that could create a dislocation.
>
> Otherwise, as far as the activities that he may do, he can walk as far as he wants, ride a bike or swim. His most aggressive activity, however, would be something like golf.

---

[4]As previously noted, Dr. Christianson was of the opinion that Turnovec's condition limited his ability to push and/or pull with his lower extremities.  (Tr. 191-194).  In contrast, Dr. Johnson took the position that Turnovec's ability to push/and or pull with was "unlimited, other than as shown for lift and/or carry."  (Tr. 199).

Tennis would not be an activity he could participate in safely.  Volleyball would not be an activity he could participate in safely.

This condition and these restrictions are permanent.

(Tr. 206).

On July 26, 2004, after experiencing continued nasal congestion and eye irritation, Turnovec reported to Dr. Gerry Lunn for a reevaluation of his allergies and asthma.  (Tr. 231).  Observing that Turnovec was in no distress and exhibited a fair range of motion in his lower extremities, Dr. Lunn gave Turnovec samples of Singulair and sent him on his way with the admonishment that he should exercise more and try to curb his alcohol consumption.  (Tr. 232).

On October 21, 2005, at Turnovec's request, Dr. Dahl wrote to the SSA to advise it of Turnovec's present condition.  (Tr. 236).  His letter read as follows:

[Turnovec] had bilateral avascular necrosis of the hips.  This resulted in the need for total hip replacements bilaterally.  He also has a history of spinal stenosis, which is also a vascular problem in the lower lumbar spine creating numbness and weakness in his legs periodically.  A vascular necrosis is a problem that can also affect the shoulders and other bones in the body.

At this point [Turnovec] is totally disabled from doing any type of labor activities.  He is restricted to moderate walking, sitting and standing.  He cannot lift more than 20 pounds on a frequent basis.  He may lift up to 30 pounds once in awhile.  He should not do any bending, stooping, squatting, or pushing or pulling weights greater than that amount, no running or jumping whatsoever.

(Tr. 236).

On June 26, 2006, Dr. Dahl wrote to plaintiff's counsel expressing his agreement with the activity level Turnovec had outlined for himself.  (Tr. 237).  He added that this activity level fell within the restrictions with respect to moderate walking, sitting, and standing that he had mentioned previously.  (Tr. 237).

## D.    ALJ Hearing

Turnovec was fifty-two at the time of the ALJ hearing.  (Tr. 247-48).  He testified that his allergies and asthma had taken a turn for the worse since undergoing hip replacement surgery and that he often experienced difficulty breathing at night.  (Tr. 247-48, 257-58, 273-74, 276).  With respect to his recent medical history, he complained of intermittent lower back and hip pain as well as circulation problems.  (Tr. 247-48, 257-58, 273-74, 276).  Although he was somewhat equivocal in regards to the etymology of his pain complaints, he alluded an apparent history of stenosis in his lumbar spine.  (Tr. 269-70).  He was quick to add that this pain had not stopped him from working in his garage or from maintaining his vehicles.  (Tr. 270-71).  He also stated that while he resorted to Tylenol for pain relief, he did not have to take it very often.  (Tr. 251).

When asked to describe his daily routine, Turnovec testified that he typically begins his day with breakfast at his girlfriend's restaurant.  (Tr. 258). He added that, following breakfast, he often runs a few errands for his girlfriend or helps out around the restaurant.  (Tr. 257-58, 261, 264). Upon completion of these errands, he typically returns home for a nap, after which he may take care of some household chores, work on small projects around his home, return to his girlfriend's restaurant, and/or run additional errands for his girlfriend.  (Tr. 259-73).

Turnovec testified that he is able to do his own housework, care for his personal needs, shop for groceries, and drive a manual transmission without difficulty.  (Tr. 262-64, 267-68).  He also testified that, while his condition has precluded him from hunting, he still fishes on the rare occasion, remains fairly active socially, and remains capable of performing simple vehicle maintenance.  (Tr. 263-65, 280).  As examples of the latter, he described recent instances when he

had changed his vehicle's spark plugs, oil, and alternator.  (Tr. 270-72).  He also testified that he can stand for half an hour a time, walk fifty yards, and lift and carry twenty pounds.  (Tr. 252).

At the close of Turnovec's testimony, the ALJ quickly summarized Turnovec's work history and then proceeded to pose a series of hypotheticals to Warran Haaganson, a vocational expert.  (Tr. 283).  The ALJ first inquired whether Turnovec could perform his past relevant work.  (Tr. 283)  Haaganson responded in the negative.  (Tr. 383).  Second, the ALJ asked Haagenson whether there were any jobs in the national economy for a hypothetical person that was Turnovec's age and who possessed the same education, relevant work experience, and physical impairments as Turnovec.  (Tr. 284).  Haaganson responded that such a person could perform a full range of light, unskilled work.  (Tr. 284).  Third, the ALJ asked whether this hypothetical person could perform a full range of light work if he had to avoid concentrated exposure to all environmental conditions but nevertheless retained the RFC to lift and carry twenty pounds occasionally and ten pounds frequently and to stand or walk for six hours in an eight hour day as a result of bilateral hip replacements.  (Tr. 284-85).  Haaganson responded that such a person could perform a number of light, unskilled jobs such as an usher, ticket taker, amusement and recreation attendant, or convenience store clerk.  (Tr. 285).  Fourth, the ALJ asked whether a hypothetical person of Turnovec's age and  work experience could still perform these jobs if he had a permanent lifting restriction of twenty pounds, was unable to do any running or jumping, could not bend his hips farther than ninety degrees, could walk as far as he liked, but could not engage in aggressive physical activities such as tennis and volleyball.  (Tr. 285-86).  Haaganson responded in the affirmative. (Tr. 286). Finally, the ALJ asked whether this hypothetical person could perform these jobs if he was restricted to moderate walking, sitting and standing, could not lift more than twenty

pounds on a frequent basis, could not do any bending, stooping, squatting, pushing, or pulling, and could neither jump nor run. (Tr. 286). Haaganson did not answer directly, stating only that it was difficult for him to ascertain what constituted "moderate walking, sitting, and standing." (Tr. 286-287).

Picking up where the ALJ had left off, plaintiff's counsel asked Haaganson about the vocational relevance of a prolonged absence from the work force. (Tr. 288). Haaganson responded that, while relevant, such an absence would have little impact on his assessment regarding an individual's ability to perform entry level work classified as light and unskilled. (Tr. 288). As for environmental concerns raised by plaintiff's counsel, Haaganson acknowledged that exposure to allergens was a risk inherent to virtually all work settings.   (Tr. 289).

### E.    ALJ Geyer's Decision

ALJ Geyer reviewed Turnovec's continuing disability in accordance with the eight-step sequential evaluation process set forth in 20 C.F.R. § 404.1594(f).[5] ALJ Geyer prefaced his review by stating that he was focusing on the period between January 26, 2000, the date of Turnovec's most recent favorable medical determination, also known as the "comparison point decision," and March 31, 2004, the rescission date. (Tr. 12-13). ALJ Geyer quicked dispensed with the first step, acknowledging that Turnovec had not engaged in substantial gainful activity through March 31,

---

[5]The regulations for determining whether a claimant's disability has ceased may involve up to eight steps in which the Commissioner must determine (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the RFC to perform any of his past relevant work activity, and (8) if the claimant is unable to do work preformed in the past, whether the claimant can perform other work.  20 C.F.R. § 404.1594; see also Dixon v. Barnhart, 324 F.3d 997, 1000-1001 (8th Cir. 2003).

2004. (Tr. 13).  Moving on to the second step, ALJ Geyer determined that, as of March 31, 2004, that Turnovec "did not have a an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526)." (Tr. 13).  At the third and fourth steps, ALJ Geyer opined that between January 26, 2000, and March 31, 2004, Turnovec's condition had exhibited marked improvement relative to his ability to work. (Tr. 14-15).  Concluding that step five was inapplicable, ALJ Geyer continued on to step six. (Tr. 14).  There, ALJ Geyer recognized that Turnovec still suffered from the severe impairments of degenerative disc disease of the hips, status post right hip replacement in April 2000, left hip replacement in August 2000, and revision of the left hip replacement in February 2001. (Tr. 14).  ALJ Geyer also recognized that Turnovec suffered from two additional severe conditions–asthma and allergies. (Tr. 14).

At step seven, ALJ Geyer concluded that Turnovec was incapable of performing his past relevant work but nevertheless retained the RFC to perform light exertional work. (Tr. 15-16).  ALJ Geyer questioned the credibility of Turnovec's testimony regarding the intensity, persistence, and limiting effects of his condition given the fact there was no record of ongoing use of pain or inflammatory medication. (Tr. 14-15).  ALJ Geyer also discounted the credibility of Turnovec's reported asthma and allergy flare ups, explaining:

> First, the claimant reported he spends time at a garage building that he owns, and engages in activities that involve environmental irritants. The undersigned finds that it is reasonable to assume that if the claimant's breathing difficulties were as limiting as he alleges that he would not spend time performing activities such as welding or car repair because of the obvious fumes and odors associated with those activities (Testimony to the Disability Hearing Officer on March 8, 2005).  Additionally the claimant's asthma and allergy impairments have only required minimal treatment since CPD. His two treatment reports were for medication refills only.  In addition, the claimant's treating physician for this condition has not required any specialized testing, such as Pulmonary Function Study to evaluate the claimant's overall

breathing status, and indication that the claimant's condition is being successfully. The undersigned finds that it is reasonable to assume that if the claimant's asthma and allergies were of a disabling nature that they would require more frequent, and perhaps, more investigative and/or aggressive intervention.  In conclusion, the undersigned finds that the claimant's severe impairments of allergy and asthma result in his ability to perform work that allows for avoidance of concentrated exposure to fumes, gases, dusts, poor ventilation, and odors.

(Tr. 16).

ALJ Geyer only afforded moderate weight to the statements made by Dr. Dahl on October 21, 2005, and June 1, 2006. (Tr. 15). ALJ Geyer initially explained that the opinion of disability was one left to the sole discretion of the Commissioner. (Tr. 15). ALJ Geyer next stated that because these statements did not provide an accurate reflection on Turnovec's functioning as of March 31, 2004, as they had been issued well after Turnovec's disability had ceased. (Tr. 15). ALJ Geyer also did not feel that these statements were not entirely consistent with Dr. Dahl's earlier pronouncements regarding Turnovec's ability to perform work-related activities. (Tr. 15).

ALJ Geyer believed that Turnovec's medical records and self-reports in 2004 provided a more accurate reflection on Turnovec's ability to perform work related activities. (Tr. 14-15). ALJ Geyer gave the greatest weight to statements made by Dr. Dahl on May 3, 2004, given their close proximity to the ending of Turnovec's disability. (Tr. 15). Consequently, ALJ Geyer incorporated these statements into his assessment of Turnovec's RFC. (Tr. 15). Based upon the impairments present as of March 31, 2004, ALJ Geyer concluded that Turnovec "had the residual capacity to perform light exertional work with lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; sitting six hours in an eight hour workday; standing and/or walking six hours in an eight hour workday; occasional climbing ramps and stairs, balancing, stooping, kneeling, crawling; never

climbing ladders, ropes, scaffolds, or crouching; and avoidance of concentrated fumes, odors, dusts, gases, and poor ventilation." (Tr. 14).

Moving on to step eight, ALJ Geyer determined that Turnovec was capable of performing a significant number of jobs in the national economy in light his age, education, work experience, and RFC. (Tr. 17). When making this determination, ALJ Geyer relied extensively upon the vocational expert's testimony that an individual of Turnovec's age that possessed his level of education, experience, and RFC could perform a variety of unskilled light jobs, such as an amusement or recreation attendant (225,000 jobs nationally), an usher (106,000 jobs nationally), or a convenience store clerk (300,000 jobs nationally). (Tr. 17).

On August 22, 2006, ALJ Geyer issued his written decision finding that, as of March 31, 2004, Turnovec could no longer be considered disabled as defined by the Act and therefore was no longer entitled to collect disability insurance benefits. (Tr. 11- 18). ALJ Geyer did, however, encourage Turnovec to file another application for disability insurance benefits because Turnovec "may be disabled as of age 55." (Tr. 17-18).

## II.    LEGAL DISCUSSION

### A.    Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review. Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). It is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

### B.    Law governing the continuing disability review process

An award of Social Security disability benefits is subject periodic review. See 20 C.F.R. § 404.1594(a). The claimant facing such review has a "continuing burden" to demonstrate that he is

disabled. <u>Nelson v. Sullivan</u>, 946 F.2d 1314, 1315 (8th Cir. 1991) (citing <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976)).  No inference should be drawn from the fact that the individual has previously been granted benefits.  <u>Id.</u>  However, if the "Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work."  <u>Id.</u> (citing 20 C.F.R. § 404.1594(b)(2)-(5)); see also 20 C.F.R. § 404.1594(b)(5) ("In most instances, we must show that you are able to engage in substantial gainful activity before your benefits are stopped.  When doing this, we will consider all your current impairments not just that impairment(s) preset at the time of the most recent favorable determination.").

The continuing disability review process is a sequential analysis set forth in 20 C.F.R. § 404.1594(f).  This review process may involve up to eight steps in which the Commissioner must determine: (1) whether the claimant is currently engaging in substantial gainful activity; (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment; (3) whether there has been a medical improvement; (4) if there has been medical improvement, whether it is related to the claimant's ability to work; (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies; (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe; (7) if the current impairment or combination of impairments is severe, whether the claimant has the RFC to perform any of his past relevant work activity; and (8) if the

claimant is unable to do work preformed in the past, whether the claimant can preform other work. 20 C.F.R. § 404.1594; see also Dixon v. Barnhart, 324 F.3d 997, 1000-1001 (8th Cir. 2003).

A medical improvement is defined in the regulations as a decrease in the medical impairments present at the time of the most recent favorable medical decision. 20 C.F.R. § 404.1594(b)(1). To determine whether a medical improvement has occurred, "the Commissioner must compare the prior and current medical evidence to determine whether there have been any such changes in the signs, symptoms and laboratory findings associated with the claimant's impairment." Rice v. Chater, 86 F.3d 1, 2 (1st Cir. 1996) (stating that "[t]he question whether a prior listing continues to be met plays at best a subordinate role in determining medical improvement and is not determinative."). Next, to determine whether a medical improvement is related to an ability to work, the Commissioner must compare the claimant's RFC at the time of his last favorable medical decision with his RFC at the time the Commissioner's most favorable medical decision. 20 C.F.R. § 404.1594(c)(2).

### C.    Analysis and Discussion

Turnovec contends that ALJ Geyer's findings were premised in part upon faulty hypotheticals and that there is not substantial evidence in the record as a whole to support ALJ Geyer's decision. He also ALJ Geyer to task for what he perceives as the manipulation and misapplication of the applicable legal standards, the utter disregard of his documented respiratory ailments, the failure to properly credit his testimony, and over reliance on the impressions of DDS physicians. The undersigned will address each of these contentions in turn, starting first with the applicable legal standards and the adequacy of the evidence of record as a whole.

### 1.    Medical Improvement

17

The Government contends that the objective medical evidence bears out ALJ Geyer's finding that Turnovec's condition had improved and that he possessed the residual function capacity for a limited range of light work as of March 31, 2004. With respect to Turnovec's allergies and asthma, the Government stresses that the SSA's initial disability findings were not predicated upon Turnovec's asthma and allergies and, in any event, that ALJ Geyer gave Turnovec every benefit of the doubt when it came to these ailments when assessing his ability to engage in work related activities. As for Turnovec's degenerative hip condition, the Government cites evidence suggesting that Turnovec did well following surgery, can ambulate without difficulty, and has reported minimal pain.

Seizing upon language used by the Eighth Circuit in <u>Burress v. Apfel</u>, 141 F.3d 875, 880 (8th Cir. 1998), Turnovec counters that ALJ Geyer applied the wrong legal standard when addressing the issue of medical improvements and, in so doing, gave his documented respiratory ailments short shrift. In addition, Turnovec takes ALJ Geyer to task for what he characterized as ALJ Geyer's failure to address several key factors, such as his age and the duration of his disability status, when rendering his decision.

> Contrary to the assertions of the Commissioner in her Memorandum, on the issue of medical improvement, the 8th Circuit has held in <u>Burress v. Apfel</u>, 141 F.3d 875, 880 (8th Cir. 1998) that the "objective medical evidence" must show "discrete improvement" in claimant's condition as opposed to "any decrease in the medical severity" to support the conclusion that the claimant can now perform substantial gainful activity. This was never addressed by the Commissioner in any manner since she chose to assert the erroneous "any decrease in the medical severity" standard instead in her prospective cessation of March 18, 2004.
>
> * * *
>
> The claimant repeatedly raised the issue of the prior determination and medical conditions, which the ALJ and the Commissioner largely ignored. The Commissioner cannot conclude that Paul's breathing impairment is not relevant

18

based on lack of medical evidence when she is aware that such evidence existed at the time of his earlier determination, but simply was not made part of the basis for the decision.  Rather she "has the duty to develop the record by obtaining pertinent, available medical records which come to [her] attention during the course of the hearing." Carter v. Chater, 73 F.3d 1019, 1022 (10th Cir. 1996).  Again there was no justification for ignoring the prior decision of the Commissioner, and skipping over Paul's worsening impairments related to his breathing.

Factors which were supposed to be considered in this cessation case included: the claimant's age (recognizing that with respiratory and orthopedic impairments, there is a deterioration with age), 20 C.F.R. 404.1594.(b)(4)(ii) and 416.994(b)(1)(iv)(B); and length of time the claimant has been on disability (recognizing that recipients who have been on disability for some time have lost skills which were used as part of their former work or lost knowledge to perform past work as it is now performed), particularly if the claimant is over the age of 50 and has been on disability "for a considerable period of time."  At the time of the initial award of benefits, Paul was 48 years of age, a "younger" individual.  At the time of his cessation determination, he was 52.  At the time of his hearings before the ALJ, he was a couple of months shy of 54 years of age, when he could have been granted an almost automatic determination of disability had he at that point filed an initial application.  Therefore, the Commissioner's failure to consider her own regulations was error.

Plaintiff's Memorandum in Support of Response to Motion for Summary Judgment (Docket No. 9), pp. 5-7.

Turnovec's assertion regarding the appropriate standard governing medical improvements amounts to nothing more than an semantical exercise.  The applicable regulations define a medical improvements as "a decrease in the medical severity."  20 C.F.R. § 404.1594(b)(1).  Thus, it would stand to reason that a "discrete improvement" can be considered synonymous to "decrease in medical severity."

In the end, the important question is not whether one can possibly draw a distinction between a "discrete improvement" as opposed to a "a decrease in the medical severity," but whether there is substantial evidence to support the Government's finding that there has been a meaningful,

positive change in the claimant's condition. Having reviewed the record, the court concludes there is such evidence in this case.

The medical evidence firmly establishes that despite suffering setbacks in the form of recalls and a revision, Turnovec had done well post-surgery and was able to ambulate with minimal pain. Dr. Dahl expressed satisfaction with Turnovec's progress, reporting in 2002 that Turnovec was doing extremely well and could walk with minimal pain.  Although he advised Turnovec to refrain from heavy lifting or engaging in impact activities, he felt comfortable in allowing Turnovec to otherwise continue "with full activity." (Tr. 210-211). The record further reflects that by  2004 Turnovec was no longer complaining of pain when sitting or standing and was only reporting discomfort when working on his knees, bending over, or when carrying too much. (Tr. 112). Dr. Dahl's notes dated February 12, 2004, stated that both of Turnovec's hip replacements were stable and Turnovec was doing very well, could ambulate without difficulty, and had excellent range of motion bilaterally. (Tr. 208).  In a letter dated May 3, 2004, Dr. Dahl suggested that Turnovec should avoid bending or lifting anything in excess of twenty pounds. (Tr. 206). Dr. Dahl was quick to add, however, that Turnovec could walk as far as he wanted, ride a bike, or swim–all activities consistent with the exertional requirements of light work. (Tr. 206). This assessment is in line with the assessments of the two consulting physicians who, after reviewing Turnovec's medical records concluded, Turnovec was capable of performing light work so long as it included no crouching or excessive hip flexion and little crawling, balancing, kneeling, or squatting. (Tr. 191-92, 198-205).

There is a dearth of medical records that speaks to the severity of Turnovec's asthma and allergies. Although Turnovec did on occasion report to Dr. Lunn, he did so for the purpose of renewing his prescriptions for Allovert and Allegra.  Notably, it does not appear from the record that

Turnovec sought out regular treatment for his allergies or asthma.  Moreover, there is nothing in the notes of his treating physicians indicating that he had any respiratory restrictions.

Turnovec remained capable of caring for his own personal needs and performing routine household tasks.  (Tr. 100, 113).  It is also worth noting that at the time of his ALJ hearing he was not relying upon medication for pain relief and that his respiratory ailments were not preventing him from working in his yard or on his car.  (Tr. 251).

### 2.    Adequacy of Hypotheticals

Contrary to Turnovec's assertions, the record bears out that his age, the duration of his disability status, and his respiratory ailments were given due consideration.  ALJ Geyer gave consideration to the fact that at the time of cessation Turnovoc was approaching advanced age as defined by the applicable regulation.  (Tr. 16).[6]  In addition, ALJ Geyer took into consideration Turnovec's age, medical history, and relevant work experience when framing his hypotheticals.  (Tr. 283-86).  Although he questioned the severity of Turnovec's respiratory condition, ALJ Geyer gave the Turnovec the benefit of the doubt with respect to his asthma and allergies when describing Turnovec's impairments to the vocational expert.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ."  Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).  "The hypothetical question must capture the concrete consequences of the claimant's deficiencies."  Id.  "Likewise the ALJ may exclude any alleged impairments that she [or he] has properly rejected as untrue or unsubstantiated."  Id.

---

[6]Also, Turnovec was on disability for slightly less than four and one-half years.  While a significant amount of time, it is questionable whether it is "considerable" within the meaning of 20 C.F.R. § 404.1594(b)(4)(iii).

Having reviewed the record, the court is satisfied that the five different hypotheticals posed by ALJ Geyer sufficiently captured Turnovec's deficiencies.  ALJ Geyer posed varying scenarios to the vocational expert that reflected the medical evidence, asking the vocational expert to at times assume Turnovec's testimony was fully credibility and to take all of the impairments described by Turnovec into consideration.  (Tr. 283-286).

### 3.    Credibility Assessments

It is well-established that courts generally afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason expressly discredits, a claimant's subjective complaints, and those reasons are supported by substantial evidence on the record as a whole.  See Haggard v. Apfel, 225 F.3d 969, 972 (8th Cir. 2000); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993).  As the Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide."  Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

When evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication;  precipitating and aggravating factors, and functional restrictions."  Id.  In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[7]  E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005).

---

[7]  In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the

Claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole.  Pearsall v. Massanari, 274 F.3d at 1218.

Although ALJ Geyer did not specifically cite the Polaski factors when making his credibility assessment, he did give consideration to the relevant factors such as frequency and intensity of Turnovec's pain and the medication, if any, he had relied upon for relief.[8]  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  Notably, Turnovec was not dependent upon pain medication for relief and remained capable of performing daily activities such as caring for his own personal needs, perform household chores, run errands, engage in social activities, and work in a garage around fumes.  Turnovec's ability to perform these activities despite his various maladies lends support to ALJ Geyer's credibility determination. See Gulliams v. Barnhart, 393 F. 3d 798, 802 (8th Cir. 2005).

With respect to subjective complaints, Turnovec tended to focus on his present condition as opposed to his condition at the time of cessation when testifying at the administrative hearing.  To

---

objective medical evidence does not fully support them.

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication; and
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.].

739 F.2d at 1322.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

[8]  The ALJ stated with regard to determining credibility, "the following factors must be considered: objective medical evidence; the nature, location, onset, duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors; type, dosage, effectiveness and adverse side effects of any pain medication; treatment, other than medication for relief of pain; functional restrictions; the claimant's daily activities; any measure the claimant uses or has used to relieve pain or other symptoms; and the claimant's prior work record."  (Tr. 30).

the extent that Turnovec's condition may have taken a turn for the worse since cessation, ALJ Geyer

directed him to file a new application.  See AR 92-2(6), 1992 WL 425419 (S.S.A. 1992) ("if the

evidence indicates that the claimant's condition may have again become disabling subsequent to

cessation of his or her disability or that he or she has a new impairment, the adjudicator solicits a

new application").  He did not err in his assessment that Turnovec's present complaints were not

necessarily indicative of his condition during period at issue.

### 4.        Reliance on Consulting Physicians

An ALJ must give controlling weight to medical opinions of treating physicians that are

supported by accepted diagnostic techniques and that are not inconsistent with other substantial

evidence.  This rule does not apply, however, to opinions regarding disability or inability to work

because these determinations are within the exclusive province of the Commissioner.  The Eighth

Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's
> medical opinions that are supported by the record. See Randolph v. Barnhart, 386
> F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion
> that an applicant is "disabled" or "unable to work," however, involves an issue
> reserved for the Commissioner and therefore is not the type of "medical opinion" to
> which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377
> F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical
> opinions that should be credited when they simply state that a claimant can not be
> gainfully employed, because they are merely opinions on the application of the
> statute, a task assigned solely to the discretion of the Commissioner." (internal marks
> omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are
> considered in assessing RFC, the final determination of RFC is left to the
> Commissioner. See 20 C.F.R. § 404.1527(e)(2).
>  . . . .
> The Commissioner defers to a treating physician's medical opinions about the nature
> and severity of an applicant's impairments, including symptoms, diagnosis and
> prognosis, what an applicant is capable of doing despite the impairment, and the
> resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is
> due 'controlling weight' if that opinion is 'well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in the record.'" <u>Hogan v. Apfel</u>, 239 F.3d 958, 961 (8th Cir. 2001) (quoting <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

<u>Ellis v. Barnhart</u>, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner.  The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law.  20 C.F.R. § 404.1504. <u>E.g.</u>, <u>Jenkins v. Chater</u>, 76 F.3d 231, 233 (8th Cir. 1996).  And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  <u>Pearsall v. Massanari</u>, 274 F.3d at 1217.

Based upon their review of Turnovec's medical records, two agency physicians determined that Turnovec was capable of performing light work so long as it did not require crouching or excessive hip flexion, crawling, balancing, kneeling, or squatting. (Tr. 191-92, 198-205).  Turnovec believes that ALJ Geyer afforded an overabundance of weight to these determinations and in the process gave short shrift the impressions of Dr. Dahl.  Specifically, Turnovec contends that ALJ Geyer erred in that he first mischaracterized Dr. Dahl's assessments as vocational opinions and then proceeded to discounted them without so much as a word of explanation.  Turnovec further contends that ALJ Geyer compounded his error by fully crediting the assessments of the two agency physicians, Drs. Christianson and Johnson, while at the same time ignoring pharmacological evidence that Turnovec was increasingly reliant upon medication for asthma, allergy, and pain relief.

The mere fact that Dr. Geyer gave credence to the assessments of Drs. Christianson and Johnson does not necessarily constitute error, however.  It is well settled that, in the context of actions such as the one before the court for review, the determinations of state agency physicians

are to be treated by an ALJ as "expert opinion evidence" and given "appropriate weight." Jones ex. rel. Morris v. Barnhardt, 315 F.3d 974, 978-79 (8th Cir. 2003). And the record reflects that is just what ALJ Geyer did. In ALJ Geyer's opinion Dr. Christianson's and Dr. Johnson's assessment of Turnovec's residual functional capacity were consistent with Dr. Dahl's assessments preceding and immediately followed cessation. Although Dr. Dahl never explicitly addressed Turnovec's ability to perform light work, there is nothing in his May 2004 letter to suggest that he felt as if Turnovec suffered from any observable manipulative or communicative limitations. Likewise, there was nothing in this letter to suggest that he considered Turnovec to be physically incapable of lifting of ten pounds frequently, lifting twenty pounds occasionally, or alternatively standing, walking, and sitting for up to six hours in an eight-hour workday.

The record also bears out that ALJ Geyer credited the Dr. Dahl's assessments, discounting only those that statements made by Dr. Dahl following cessation. And, as the following excerpt from his findings illustrates, ALJ Geyer was able to articulate a reasonable basis for his decision to discount these latter statements.

> The undersigned gives moderate weight to these two statements of function [contained in Dr. Dahl's letter of October 21, 2005] for several reasons. First, the October 21, 2005, opinion of disability is one left to the sole discretion of the Commissioner. As such, this opinion has been carefully considered in the determination of disability, but cannot be given controlling weight. Second, they do not detail a function analysis of the claimant's ability to perform work-related activities. Third, they were made up to two years after the claimant's disability ceased. And, as such, they are not accurate reflections of the claimant's functioning as of March 31, 2004. Fourth these opinions are not supported by Dr. Dahl's prior statements of the claimant's ability to perform work-related activities. For example, two years before disability ceased the claimant saw Dr. Dahl on January 29, 2002. It was 11 months after his last hip surgery. The claimant reported he found "it a little bit hard to get up from the kneeling position.["] Dr. Dahl stated he should "continue with full activity." He should avoid heavy lifting and no impact activities.

Around the time that disability ceased, the claimant again saw Dr. Dahl. On May 3, 2004, Dr. Dahl stated that the claimant was doing well status-post total hip replacement surgery. He recommended taht the claimant perform no running or jumping. He should always step down from a platform or truck, not jump. He can lift 20 pounds. Periodically, he can lift 30 to 40 pounds up to one time to move it, but not to carry it. He should be restricted to not bending his hips farther than 90 degrees or get it into a precarious position that could create dislocation. D.r Dahl concluded by stating "Otherwise, as far as the activities that he may do, he can walk as far as he wants, ride a bike, or swim. His most aggressive activity, however, would be something like golf." The undersigned gives this opinion the greatest weight, as it is consistent with the overall medical evidence showing great results from the last round of hip replacement surgeries. Further, Dr. Dahl's statement of May 3, 2004, was completed in close proximity to the March 31, 2004, ending of the claimant's disability. So, it most accurately reflects the claimant's functioning ability at the time. The undersigned has incorporated Dr. Dahl's May 3, 2004, opinion of the claimant's work abilities into the above residual functional capacity.

(Tr. 15).

As for the pharmacological evidence, it does not paint a picture of disability as Turnovec suggests. Although Turnovec was initially prescribed pain medication following his hip replacement surgeries, he relies primarily upon Tylenol for pain relief and only on occasion. As for his asthma and allergies, there is little in the way of medical evidence to suggest that these conditions have adversely impacted his daily routine or caused him to curtail his daily activities. Moreover, it appears that ALJ Geyer gave Turnovec the benefit of the doubt with respect to his allergy and asthma flare ups when assessing his residual functional capacity, acknowledging that these conditions required him to avoid concentrated exposure to gases, dusts, fumes, poor ventilation, and odors, despite the fact that he remained capable of welding and working in garage around fumes. (Tr. 16). And the government has pointed out, there is nothing in the notes of Turnovec's treating physicians to suggest that Turnovec had any respiratory restrictions; his physicians tended to focus primarily degenerative hip condition as opposed to asthma or allergies.

**III.    CONCLUSION AND RECOMMENDATION**

As long as substantial evidence in the record supports the ALJ's decision, a court may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because this court would have decided the case differently.   Holley v. Massanari, 253 F.3d at 1091.

Having reviewed the record, the undersigned concludes there is substantial evidence to support ALJ Geyer's decision.    Accordingly, it is hereby **RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Docket No. 6) be **GRANTED** and that this matter be **DISMISSED**.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation.

Dated this 7th day of August, 2007.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge

28